Thank you. May it please the Court, Mark Rolfing on behalf of Dorothy Jean Nursement. This is a Social Security SSI claim. In the year 2000, an ALJ Alexander found that Ms. Nursement suffered from a form of mental retardation or autism in the form of borderline intellectual functioning. And as a result of that severe mental impairment, Judge Alexander found that Ms. Nursement was limited to simple one- and two-step instruction. You're talking about the first time, right? That's correct. Let me ask you something. The first time she got turned down for disability, the judge said she has the mental limitations but her physical limitations aren't bad. And then the second time she applied, the judge said her physical condition was worse but her mental condition was better. Now, if I understand your argument right, what you want is a kind of collateral estoppel or res judicata to hold on to the bad mental condition from the first time but get to relitigate the physical condition because of a change. I don't understand that because to me it seems like common sense, which may not be the law, that's why I need some education, that things change and both your mental and your physical condition affect your ability to work and either one can get better, get worse, or stay the same. So I don't know why the second ALJ can't consider the change in the circumstances of her mental condition as well as her physical. That's an excellent question, Judge. There isn't any evidence that her mental condition improved. Dr. Garcia, who did the record review on the second case, didn't even endorse the box for 1205 mental retardation or borderline intellectual function, didn't consider it. There was some medical evidence that she was doing better on her mental condition. She'd moved out of her mother's house and she was functioning better with meds. Nobody said that. In fact, the second ALJ, Judge Agatstein, was particularly critical of Ms. Nurseman for not following through on mental health treatment for her depression. The only evidence that her mental condition, her ability to perform simple one- and two-step instructions or simple and repetitive tasks with mild limitations and detail and complex is the single page of Dr. Griffin's testimony. His testimony is on a single page where he says she's got some depression, and by the way, there's some old records that say that she has borderline intellectual functioning, and so I would limit her to simple repetitive tasks with mild limitations and detailed and complex tasks. That's the only evidence that the government has to upgrade her mental functioning, and that isn't the kind of new and material evidence to drag that stick that Judge Alexander put in the ground and drag it over to say that her mental condition got better. Before we get to that, though, as I understood your pleadings, and perhaps I didn't understand them correctly, I thought you were worried about the change of the position on that, and so you asserted that the mental and physical components had to be considered separately and that res judicata applied to one of them. Is that correct? That's correct. Now, do you have any authority for that concept that these, the mental and the physical components, are to be separately evaluated? Any case law, any regulations, anything? When we start the modern analysis with Chavez versus Bowen, and the Chavez and the Sixth Circuit, the Dennard and the Fourth Circuit, Lively, they all stand for the proposition that findings grow roots and they dig themselves in the ground and they're solid unless there's new and material evidence to show that that finding should change. And I get that. I get that. I get the concept of applying res judicata and collateral estoppel. But that's not my point. My point is you seem to have divided them, the mental and the physical, and I'm asking you is there any authority that you're aware of that authorizes us to do that? I'm not aware of any authority either way, Your Honor. Well, that's the same way of saying there isn't any authority, right? Yes. Okay. I'm sure my worthy opponent would agree that there's no authority for the proposition. Okay. The government and the district court used this phrase that it's an indivisible integrated finding. And that phrase, that indivisible integrated finding, isn't in the regulations. It isn't in Social Security ruling 96-8-P. It isn't part of the jurisprudence. I agree. It's made up. But at the very least, you would have to say that even though there may not be anything against it, there's also nothing for it. We would be creating a new legal avenue, if you will, were we to agree with your assessment. Yes. Okay. Yes. And I think that there are some really firm public policy reasons for adopting that kind of analysis. When the first ALJ says, well, you're pretty bad off mentally, but physically you can do some things, so the agency is going to find that you can work. And the second ALJ says, well, you're much worse off physically, but I'm going to find that you're better off mentally, even though we know common sense, that borderline intellectual functioning doesn't improve, mental retardation doesn't improve. Well, there are two things wrong with her. She wasn't very smart, and she had depression. It's hard to do anything about not being too smart, but people who aren't too smart can often make a living. Many of them are in government. The depression or the not very smart? Maybe the latter two. I don't know. The depression, they now have really good medicine that changes the serotonin reuptake, and they have medicines for L-DOPA. And depression seems to be a chemical phenomenon that is, in most cases, remediable by medication. I agree, Your Honor. In many cases it was. Also, sometimes it goes away by itself. Absolutely. And there are a lot of things that we don't understand about the human psyche, but we do now. And a lot of things we do now. Yes. I mean, it's amazing how much can be done. And her depression the second time was regarded as not being bad enough to, even in combination with her low IQ, to affect her ability to work. In the first case, though, Your Honor, she had no depression. She wasn't diagnosed with depression in the first case. She was only diagnosed with borderline intellectual functioning. That was the sole basis for the simple one and two step, the no math, the third grade reading level. And so we add in this remedial depressive condition, and we expect her to do what she needs to do to take care of her mental health condition. But that doesn't mean that she's cognitively more intact than she was without the depression. Depression doesn't make people better unless you're Hemingway. Let's assume for a minute that you're absolutely right about all of this. My understanding is that you have not challenged the ALJ's finding at step five, that your client was able to work and not disabled under the SSA. Is that correct? That is not true. It's not correct. That is not true. Okay. Where in your brief do you challenge that? It's the five step sequential evaluation process. Right. And so we're challenging the step four analysis. I understand that. But there was a, in the analysis by the ALJ, got to step five and found that she was able to work and not disabled under the SSA. I don't remember where you challenged that. I'm asking for you to correct me on that. The ALJ found that she was limited to simple repetitive tasks and mild limitations. But on jobs that were available in the economy, right? Right. And the vocational expert testified that such a person could perform the work that was identified. But the vocational expert didn't assume the sedentary. Okay. So you're saying that because there was an error on step four, that the vocational expert didn't assume the problems that you say existed in four that were not dealt with. Is that correct? Yeah. Once we take that step four domino out, the step five necessarily fails. I know that some lawyers do brief failure to propound a complete hypothetical to the vocational expert when they're alleging limitations that the ALJ didn't find. That's not a proper use. But haven't you kind of put yourself in a little bit of a box there in the sense that if we find that, and you can see that you can't split the mental and physical components unless we decide that you can, that unless the evidence is as you indicate, and I think you'd admit there's contrary evidence that basically you lose because you're not contesting step five. Is that right? I'm not independently contesting step five. That's correct. All right. I'm only contesting the step four question, which pollutes the step five analysis. Do you mind if I answer that? No, no, please. When I read this, my thought was it's hard to see who's going to hire her because she's in bad physical shape, pretty limited mentally. And I was trying to figure out why the ALJ turned her down. And then I think I figured out why he turned her down. He didn't believe her. He thought she was lying about her depression. Diagnosis depends on the patient accurately and truthfully reporting symptoms. And the reason he thought she was lying is that she testified that she had auditory hallucinations. But whenever she talked to a psychiatrist, she denied having hallucinations, auditory or visual. Psychiatrists always ask that. They did ask that, and she said she didn't. So the ALJ evidently thought, well, she must be lying about how impaired she is mentally and no reason to think that her lies about how she's impaired mentally are limited to the hallucinations. It looked like that's what made him think her depression, that and not going and getting treatment for depression are what made him think her depression really didn't amount to much. And we can take the depression completely out and throw it away, and that still leaves the borderline intellectual functioning that Judge Alexander assessed. That leaves her with one and two, no math, and very little reading. And that's the problem is that the fact that we didn't brief her credibility in this case intentionally for the reasons that you just described. Half the people in the workforce are below average intellectually probably. Half the lawyers in the country are below average in capability of other lawyers. So, I mean, by definition. But she's not below average. She's way below average. She's almost two standard deviations away from the mean. She can barely do math. She's at 73. Is that where she is? Yes. 72, 73. She's two steps away, two points away from being classified as mentally retarded. Two points away. If she really pried on the tests. But the psychologist and Judge Alexander didn't criticize her and didn't say that those test results were invalid. There was no allegation in the 2000 decision that those test results were invalid for any reason. And Judge Alexander found that she was limited, and then Judge Agatstein said that she was less limited. And without any substantial basis for elevating her RFC. None at all. Do you have any questions, Judge Fletcher? No more. Okay. Thank you very much. We'll hear from the government. Good morning, Your Honors. May it please the Court. Jeffrey Chen on behalf of the Commissioner of Social Security. Michael J. Astru. Judge Kleinfeld, I want to start by answering your question, and Judge Smith's question as well, about what new medical evidence there is. In the 2000 decision before Judge Alexander, the only medical evidence of mental impairments was the one-time constate examination by psychologists Yost and Levin, which diagnosed the borderline intellectual functioning. Since then, there's been additional, significant amounts of additional medical evidence that changes the characteristics of record. As Judge Kleinfeld indicated, plaintiff's appellant's condition changed significantly. There was a consultative examination with Dr. Bagner, who did not diagnose borderline intellectual functioning, and concluded that with antidepressant medication, plaintiff's condition should significantly improve within six months. The medical records from LAC-USC Health Care Center indicates that plaintiff did, in fact, receive such treatment, including prescriptions of Zoloft and Prozac. Two state agency physicians, Dr. Garcia and Dr. Morillo... Does that mean that the IQ number may not be accurate? The IQ number of the one-time constative examination included a finding that the plaintiff's concentration was variable at the time, and given that she had no mental health treatment before then, it is uncertain what maybe other psychiatric causes affected her performance at the time. So basically, the IQ number may or may not change. We don't know based on the evidence, but if she was distracted and having other issues that were treated by medication, there is at least a possibility that would change. Is that right? That's correct, Your Honor. More importantly, I want to address the point that you're making, which is basically that appellant focuses on the constancy of IQ of borderline intellectual functioning, but this is not really the focus of RFC. RFC is about what an individual can do despite their impairments. RFC acknowledges that... What she can do, apparently, she can read at the second-grade level, and she can do arithmetic at the fifth-grade level. She's at the third-grade level at spelling. So we've got a person who's... Would you want to hire? Bottom line. Not in her condition as of the year 2000, Your Honor, but I'd like to point out, based on the record, that her functional limitations were, in fact, not so limited even earlier in her life, even though appellant argues that borderline intellectual functioning means that her IQ is constant. The record demonstrates that plaintiff, in fact, finished 10th grade and only left school because she got married, so clearly she could not have only been able to read at a second- and third-grade level her entire life. The sad part about our system of education is that we push them through and graduate them even. She didn't graduate, but we do it even though they have these functional limitations. She got left behind. Well, I would also like to point out, Your Honor, that she also worked... Even though in 2000 Judge Alexander found that appellant could not do any math, she, in fact, used to work at a bingo hall as a waitress, a job that clearly requires some math if only to count tips and make change. I'm troubled by something along the same lines as Judge Fletcher. If somebody is not too smart, often you can hire them for a very simple job that just requires a strong back. But with this woman, you can't hire her for a job... with all the problems secondary to obesity that she has, like her knees and her back. And the intellectual functioning, I can see where her effort would contribute tremendously to her score on an IQ test. It's just a paper test. And, gosh, you could have a bad day at the LSAT because you were sick or because you were distracted or because you didn't try or even because you thought not trying would make you more likely to win your lawsuit. Is there a second IQ test? No, Your Honor. The record does not indicate a second IQ test taken by... Was it a paper test? I assume it was because usually a psychologist administers a paper test for IQ. I'm not aware of the two consultative examiners performed mental status exams and tested her insight, knowledge and awareness, but I don't believe they implemented a second IQ test, Your Honor. Typically a psychologist will give the person a paper test and a psychiatrist will ask them questions like, who's president, recite your phone number backwards, things like that. And is there any detail about the tests here? Only on the first, the original test by psychologist Yoson Levin, they put her through, I believe, the WRAT test, and that's how they generated her intelligence scores in verbal, mathematic and overall. But there was not a second test to determine her intelligence, Your Honor. But I would like to answer your earlier question, which is regarding the type of jobs. The plaintiff, at the time of the ALJ's decision, was characterized as a younger individual below age 50. The vocational expert identified only sedentary, unskilled jobs. What was she, in her 20s? No, she was 48, I believe. I'm mixing it up with another case. Yeah, I believe her, yes, 48, 49 at the time of the decision. And essentially, a plaintiff could perform such sedentary jobs, unskilled jobs, such as lampshade assembler, which was in a seated position and does not require tremendous physical exertion. So there are jobs available. Correct me if I'm wrong. One of the things I found when I joined the court was how very tough this law is. Congress, in its wisdom, has decided that if somebody can go through the five-step process here, as opposed to a 12-step process, and they get to the fifth, and based on a vocational expert's testimony, they can perform some function in the national economy. However minimal, they're not entitled to the benefit. This is a very sympathetic petitioner here. I mean, she's obviously got some real difficulties. But are we, as a court, in a position to do anything if Congress has said, if she gets through, assuming that the issues raised by your co-counsel there don't change the result, we're kind of stuck, aren't we? I mean, they did find she could do a job in the national economy. Yes, Your Honor. Congress has made Social Security contingent on the inability to perform any substantial gainful activity in the national economy. And I would just like to address your earlier question that, while sympathetic medically, the current ALGA did find that plaintiff was not credible, not just because of, or maybe this was Judge Kleinfeld, not just because of her inconsistent claims about the hearing of voices, in which she stated that she heard voices at the hearing, but denied at both consultative examinations. But she also feigned vision loss at an ophthalmological exam. Her past criminal history. What did she do? I couldn't hear a word. I'm sorry. The ALGA also found her not credible because she feigned vision loss at an eye exam. She had a history of shoplifting, a crime of moral turpitude as found by the ALGA, and by her attempt to deny that she had the past criminal history of shoplifting and her extremely poor work history demonstrated little commitment to work. Plaintiff does not, appellant does not challenge the adverse credibility findings whatsoever. So in regards to, though she has genuine medical problems, she's simply not credible based on her subjective symptomatology. If there are no additional questions. Any questions from my colleagues? I guess we don't. The Commissioner respectfully urges that this Court affirm the decision below. Thank you. We gave you a little extra time. Counsel, we'll give you a minute to respond if you'd like. Thank you very much. There isn't any evidence that Dorothy Nurseman learned how to read, learned how to do math, and learned how to spell in the intervening eight years. Evidence just isn't there. She's had a rough life. People that hallucinate, do you hallucinate? No, but you don't perceive things that are real. That's what they tell me. You're referring to the judiciary here? No, no. But she's a sympathetic person on the objective findings, on the IQ testing, which there are some written components, some oral components, but on the IQ testing and on the physical impairments, pressing her down into the sedentary range of work. When we marry those two sets of limitations together, we're squeezing this fruit at both ends and there's nothing left. Please remand this case so that a vocational expert can assume both the mental limitations properly found by Judge Alexander and the physical limitations found by Judge Agassi. Thank you. Thank you, Mr. Rolfing. The case of Nurseman v. Astru is submitted. We will next hear argument in the case of Hexel Corporation v. Ionos Polymers.
judges: Fletcher, Kleinfeld, Smith